A08A1295. LIBERTY LENDING SERVICES v. CANADA.
(668 SE2d 3)

BLACKBURN, Presiding Judge.

In this civil action, Irene Canada sued Liberty Lending Services ("Liberty"), individually and on behalf of a class of similarly situated

persons, alleging that Liberty breached the terms of a security deed by failing to provide written notice prior to assessing inspection and attorney fees that it incurred to protect its interest in the subject property during Canada's bankruptcy. Liberty appeals from the certification of the class, arguing that the trial court abused its discretion in certifying the class under OCGA § 9-11-23 (a) and (b). For the reasons set forth below, we affirm.

The record shows that in 1984, Canada purchased a home, which she financed with a loan from Nationwide Lending Group that used the property as security for the debt. Subsequently, the loan was transferred and assigned to Liberty for servicing. Paragraph 7 of the security deed provides in part:

> If Borrower fails to perform the covenants and agreements contained in this Deed or if any action or proceeding is commenced which materially affects Lender's interest in the Property including but not limited to eminent domain, insolvency, code enforcement or arrangements or proceedings involving a bankrupt or decedent then Lender at Lender's option, upon notice to Borrower may make such appearances, disburse such sums and take such action as is necessary to protect Lender's interest including but not limited to disbursement of reasonable attorneys fees and entry upon the Property to make repairs. . . . Any amounts disbursed by Lender pursuant to this paragraph 7 with interest thereon shall become additional indebtedness of Borrower secured by this Deed.

Paragraph 8 of the security deed provides: "Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property." In addition, paragraph 18 of the security deed outlines the lender's remedies in the event of default and provides that "Lender shall be entitled to collect all reasonable costs and expenses incurred in pursuing the remedies in this paragraph 18, including, but not limited to, reasonable attorney fees."

In 1996, Canada defaulted on the loan, and as a result, Liberty notified her that it would be foreclosing on the property and seeking attorney fees pursuant to OCGA § 13-1-11 if the default were not cured. Shortly thereafter, Canada filed a Chapter 13 bankruptcy petition to prevent the foreclosure. During the bankruptcy, Canada brought her loan current by paying all arrearages and by making her regular monthly payments. During the bankruptcy, Liberty con-

ducted inspections of Canada's property to protect its interest pursuant to paragraph 8 of the security deed and assessed inspection and attorney fees pursuant to paragraph 7. On August 5, 2001, the bankruptcy court discharged Canada. However, at that time, Liberty's records reflected that the unpaid principal balance of Canada's mortgage was $48,817.09. Thus, despite the fact that Canada attempted to bring her loan current during the bankruptcy, she was still in default when it was discharged.

Approximately one month after the discharge, Liberty notified Canada by letter of the default and that it would foreclose on her property if the default were not immediately cured. The alleged default was premised on Canada's failure to pay $2,748.02 in inspection and attorney fees that Liberty had incurred with respect to her loan during the bankruptcy. Prior to receiving the foreclosure letter, Canada was unaware that these fees had been assessed against her, as they had never been reflected on any statement sent to Canada or any documents filed with the bankruptcy court. Canada had received no notice of these fees as they accrued because, as a matter of policy, Liberty refrains from providing notice of, or demanding payment for, such charges against a mortgagor in bankruptcy. One month later, when the default had not been cured, Liberty notified Canada that it was starting foreclosure proceedings.

In November 2001, Canada sued Liberty, alleging that it breached the terms of the security deed when it conducted inspections of her property and assessed fees related to those inspections, as well as attorney fees, without prior notice. Canada further alleged a claim of conversion and that Liberty had assessed attorney fees in violation of OCGA § 13-1-11. Shortly after filing suit, Canada obtained a temporary restraining order ("TRO") that enjoined Liberty from foreclosing on her property.[1] Liberty answered and denied all of Canada's allegations. In April 2003, Canada amended her complaint to include six separate breach-of-contract counts (all of which related to Liberty's failure to provide prior notice of the assessment of inspection and attorney fees), two theft counts, one Georgia RICO count, and a count alleging that Liberty failed to comply with OCGA § 13-1-11. She requested damages in the amount of the improperly assessed fees as well as injunctive relief. In addition, Canada sought class certification.

In March 2007, Canada moved the trial court to re-open discovery on class certification issues. The trial court granted the motion, and additional discovery commenced, including the depositions of Canada and of J. B. Stamper, Liberty's designated Rule 30 (b) (6)

[1] This TRO was in effect at the time the notice of appeal was filed.

YALE LAW LIBRARY

representative. Subsequently, Canada filed a motion for class certification, which sought to have the class defined as:

> All persons whose home loans were serviced by [Liberty] and: 1) who have filed Chapter VII or Chapter XIII bankruptcy proceedings, and 2) who have, since May 1, 1999, been charged fees for inspections and/or attorney fees without having been given written prior notice before the assessment of each inspection fee and each attorney fee; and 3) the assessed fees were not approved by a bankruptcy court.

In the same motion, Canada also sought to certify a subclass, which she defined as:

> All persons whose home loans were secured by residential property located in the State of Georgia, whose home loans were serviced by [Liberty] and: 1) who have filed a Chapter VII or Chapter XIII bankruptcy proceeding, and 2) who have, since May 1, 1999, been charged fees for inspections and/or attorney fees without having been given written prior notice before the assessment of each inspection fee and each attorney fee; and 3) the assessed fees were not approved by a bankruptcy court.

A hearing on class certification was held, in which Canada testified and in which she introduced her security deed and the deposition of Liberty's 30 (b) (6) representative as evidence. Additionally, Canada introduced fifty-one (one for each state and the District of Columbia) 2007 Fannie Mae form mortgages, which Canada's counsel had obtained from Fannie Mae's website before the hearing, as evidence that the terms of the security instruments for the class members were nearly identical to the terms in Canada's security deed. In support of her contention that the form mortgages were similar to those of the putative class, Canada read portions of the deposition of Stamper (Liberty's 30 (b) (6) representative) into the record. In his deposition, Stamper testified that Liberty's policies are standard throughout the United States — i.e., it follows the same procedures with respect to any homeowner who files for bankruptcy, regardless of where the property is located. Stamper further asserted that Liberty's standard procedures with respect to such homeowners are justified by any security agreement that it holds, regardless of who originally issued that agreement and regardless of where it was issued. According to Stamper, Liberty bases this position on the fact that, to be marketable, a security agreement must contain provisions

which ensure that the security deed is what Liberty terms "agency paper" — i.e., that the deed meets Fannie Mae or Federal Home Loan Bank guidelines for security agreements. Again according to Stamper, these provisions would include language materially similar to that contained in Canada's security agreement and on which Liberty relies in asserting a contractual right to engage in the conduct at issue. The trial court admitted the documents into evidence.

After the hearing, the trial court issued a detailed written order certifying the class. In its order, the trial court found that given Stamper's testimony, the Fannie Mae form mortgage agreements were similar enough to Canada's mortgage and proved the relevant terms of the security deeds of the putative class. The trial court further found that the central question common to all class members is whether standard language contained in all security agreements serviced by Liberty grants Liberty the contractual right to engage in the conduct at issue. This appeal followed.

1. Liberty contends that the trial court abused its discretion in certifying the class under OCGA § 9-11-23 (a) ("Rule 23 (a)"), arguing that the requirements under this subsection of the statute were not met. We disagree.

"Certification of a class action is a matter of discretion with the trial judge, and, absent abuse of that discretion, we will not disturb the trial court's decision." *UNUM Life Ins. Co. of America v. Crutchfield.*[2] We apply the "clearly erroneous" standard of review to the trial court's ruling, and we must affirm if the ruling is supported by any evidence. "[W]e will not reverse the factual findings in a trial court's class certification order unless they are clearly erroneous." *Village Auto Ins. Co. v. Rush.*[3] "In determining the propriety of a class action, the first issue to be resolved is not whether the plaintiffs have stated a cause of action or may ultimately prevail on the merits but whether the requirements of OCGA § 9-11-23 (a) have been met." (Punctuation omitted.) *Duffy v. The Landings Assn.*[4] See *Ford Motor Credit Co. v. London.*[5] These requirements are:

> (1) numerosity — that the class is so numerous as to make it impracticable to bring all members before the court; (2) commonality — that there are questions of law and fact common to the class members which predominate over any

[2] *UNUM Life Ins. Co. of America v. Crutchfield*, 256 Ga. App. 582 (568 SE2d 767) (2002).
[3] *Village Auto Ins. Co. v. Rush*, 286 Ga. App. 688 (649 SE2d 862) (2007).
[4] *Duffy v. The Landings Assn.*, 254 Ga. App. 506, 507 (1) (563 SE2d 174) (2002).
[5] *Ford Motor Credit Co. v. London*, 175 Ga. App. 33, 37-38 (332 SE2d 345) (1985).

YALE LAW LIBRARY

individual questions; (3) typicality — that the claim of the named plaintiff is typical of the claims of the class members; (4) adequacy of representation — that the named plaintiff will adequately represent the interest of the class; and (5) superiority — that a class action is superior to the other methods of fairly and efficiently adjudicating the controversy.

(Punctuation omitted.) *Carnett's, Inc. v. Hammond.*[6]

(a) *Commonality.* (OCGA § 9-11-23 (a)). In reviewing whether this requirement was met, we must analyze Canada's breach-of-contract claim and determine whether the class members were similarly situated. See *Carnett's, Inc.*, supra, 279 Ga. at 127 (3). In support of its conclusion that the requirements of Rule 23 had been met, the trial court found:

> The core and predominant issues presented by this class action are whether or not the provisions of paragraphs seven and nine of the standard Fannie Mae mortgage language authorize[s] mortgagees and their servicers such as Liberty to assess against mortgagors after they have been discharged or dismissed from bankruptcy the attorney fees and inspection fees that the mortgagee or its servicer has incurred since the filing of bankruptcy and without any adjudication by a bankruptcy [court] of its entitlement to such fees.

Here common questions of law exist that predominate over any individual questions, and we agree with the trial court's conclusion that the class members were similarly situated. As explained supra, Stamper, Liberty's 30 (b) (6) representative, asserted that all security deeds that it services contain materially similar language with respect to a lender's rights in the event a mortgagor files for bankruptcy. Because of this fact, Liberty is able to implement its standard procedures with respect to mortgagors who enter bankruptcy without ever reviewing any individual loan agreement to ensure that it does afford Liberty such rights. Thus, Liberty's own admissions, standing alone, are sufficient to support the trial court's finding on this issue.

This finding is further supported by a comparison of Canada's security agreement with the Fannie Mae standard form mortgage agreements. As mentioned, the relevant portions of Canada's secu-

---

[6] *Carnett's, Inc. v. Hammond*, 279 Ga. 125, 126 (2) (610 SE2d 529) (2005).

rity deed are paragraphs 7 and 8. Paragraph 7 provides, in relevant part, that should the homeowner default on her obligations and/or declare bankruptcy then the Lender may, upon notice to the Borrower, "make such appearances, disburse such sums, and take such action as is necessary to protect Lender's interest, including, but not limited to, disbursement of reasonable attorney's fees and entry upon the Property to make repairs." The paragraph further provides:

> Any amounts disbursed by Lender, pursuant to this paragraph 7, with interest thereon shall become additional indebtedness of Borrower secured by this Deed. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof, and shall bear interest from the date of disbursement at the rate payable from time to time on outstanding principal under the Note unless payment of interest at such rate would be contrary to applicable law, in which event such amounts shall bear interest at the highest rate permissible under applicable law.

Paragraph 8 of Canada's security deed provides that the "Lender may take or cause to be made reasonable entries upon inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property."

As the trial court found, similar language appears in paragraphs 7 and 9 of the "Uniform Covenants" contained in each of the Fannie Mae standard form mortgage agreements. Paragraph 7 of each such form grants the lender the right to "make reasonable entries upon and inspection of the [p]roperty." The lender may also inspect "the interior of the improvements on the property," provided it has reasonable cause to do so. The lender must provide the mortgagor with notice of such reasonable cause either before or at the time of such interior inspection.

Paragraph 9 of the standard forms provides that in the event the homeowner declares bankruptcy, "the Lender may do or pay whatever is reasonable and appropriate to protect [its] interest in the Property and its rights under" the loan agreement, including "paying reasonable attorneys' fees to protect . . . its secured position in a bankruptcy proceeding." The paragraph further provides:

> Any amounts disbursed by Lender under this [paragraph] 9 shall become additional debt of Borrower secured by this

Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

Based on this comparison, we agree with the trial court's findings that there is no material difference between the relevant language found in paragraphs 7 and 8 of Canada's security agreement and that found in paragraphs 7 and 9 of the Fannie Mae standard form mortgages. Liberty nevertheless argues that a pre-lawsuit notice provision contained in the form mortgages precludes a finding of commonality. However, this assertion was not raised below and thus provides nothing for us to review. See *Johnson v. First Union Nat. Bank*.[7] Moreover, " 'as long as common issues predominate,' a class may be certified even if some individual questions of law or fact exist." *Village Auto Ins. Co.*, supra, 286 Ga. App. at 691 (1). Accordingly, the trial court did not abuse its discretion in finding that Canada met the commonality requirement under Rule 23 (a). See *J.M.I.C. Life Ins. Co. v. Toole*[8] (commonality requirement met where it was undisputed that class members executed materially-similar form contracts); *UNUM Life Ins. Co. of America*, supra, 256 Ga. App. at 583 ("[C]laims arising from interpretation of form agreements are considered to be 'classic' cases for treatment as a class action.") (punctuation omitted).

(b) *Typicality*. Liberty also argues that Canada failed to meet the typicality requirement under OCGA § 9-11-23 (a). We disagree. The typicality requirement under OCGA § 9-11-23 (a) is satisfied upon a showing that the defendant "committed the same unlawful acts in the same method against an entire class." *Kennedy v. Tallant*.[9] Here, as previously discussed, Canada has alleged that Liberty's standard conduct with regard to assessing inspection and attorney fees against her and all similarly situated bankrupt mortgagors constituted breach of contract, fraud, theft, and conversion. Canada's claims and those of the class are thus one and the same, and the trial court did not abuse its discretion in finding that the proposed class meets the typicality requirement. See *J.M.I.C. Life Ins. Co.*, supra, 280 Ga. App. at 377-378 (2) (c).

---

[7] *Johnson v. First Union Nat. Bank*, 255 Ga. App. 819, 820 (1) (567 SE2d 44) (2002).

[8] *J.M.I.C. Life Ins. Co. v. Toole*, 280 Ga. App. 372, 377 (2) (c) (634 SE2d 123) (2006).

[9] *Kennedy v. Tallant*, 710 F2d 711, 717 (II) (11th Cir. 1983). We note that Georgia courts may rely on federal class action cases as persuasive authority. See *State Farm &c. Ins. Co. v. Mabry*, 274 Ga. 498, 499 (1) (556 SE2d 114) (2001).

(c) *Adequacy of Representation*. Liberty further argues that Canada failed to meet the adequacy of representation requirement under OCGA § 9-11-23 (a). Again, we disagree.

"The important aspects of adequate representation are whether the plaintiffs' counsel is experienced and competent and whether plaintiffs' interests are antagonistic to those of the class." (Punctuation omitted.) *Taylor Auto Group v. Jessie*.[10] Here, Liberty contends that Canada's interests are antagonistic to those of the class, arguing that because Canada's property will most likely be foreclosed upon once this dispute is resolved and the TRO is lifted, Canada has no incentive to resolve the case. However, Liberty has no evidence to support its speculation other than the length of time the case has been pending thus far. In fact, during the class certification hearing, Canada specifically testified that she had not attempted to drag out the lawsuit. The trial court's reliance on this testimony was not clearly erroneous. See *Village Auto Ins. Co.*, supra, 286 Ga. App. at 688.

Liberty also contends that Canada cannot adequately represent the class, arguing that because Liberty sold Canada's mortgage to another mortgage company prior to class certification, Canada lacks standing to request injunctive relief. Canada's alleged lack of standing, however, was never argued before the trial court. "[I]ssues presented for the first time on appeal furnish nothing for us to review." *Johnson*, supra, 255 Ga. App. at 820 (1). Thus, the trial court did not abuse its discretion in ruling that Canada was an adequate representative of the class.

2. Liberty contends that the trial court abused its discretion in certifying Canada's monetary damages claims under OCGA § 9-11-23 (b) (3). We disagree. Before claims can be certified for class action under this subsection of OCGA § 9-11-23, Canada must show "that there are questions of law and fact common to the class members which predominate over any individual questions." (Punctuation omitted.) *Griffin Indus. v. Green*.[11]

> Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief. Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their

---

[10] *Taylor Auto Group v. Jessie*, 241 Ga. App. 602, 603-604 (2) (527 SE2d 256) (1999).

[11] *Griffin Indus. v. Green*, 280 Ga. App. 858, 859 (635 SE2d 231) (2006).

individual claims, such claims are not suitable for class certification under Rule 23 (b) (3).

(Punctuation omitted.) *Roland v. Ford Motor Co.*[12]

Here, Canada is asserting that Liberty assesses inspection and attorney fees in a similar manner regardless of the exact terms of the security contracts it services. She further asserts that the contracts at issue should be interpreted as requiring Liberty to give notice to a bankrupt mortgagor prior to assessing inspection and attorney fees against the mortgagor during the pendency of the bankruptcy and that such notice be given at the time the fees are assessed against the mortgagor's account, even though no specific language in either her security agreement or those of the putative class explicitly impose such a requirement. Canada also argues that Liberty's practice of accumulating inspection and attorney fees and not giving any notice thereof until after discharge in bankruptcy is improper. In addition to her breach of contract claims, Canada asserts that Liberty's interpretation of the security agreements so as to avoid the protections afforded by the bankruptcy laws breaches the implied contractual duties of good faith and fair dealing and that Liberty's conduct amounts to fraud, theft, and conversion. Liberty argues that issues of damages are too individualized to warrant class certification. However, minor variations in amount of damages do not destroy the class when the legal issues are common. See *Earthlink, Inc. v. Eaves*;[13] *UNUM Life Ins. Co. of America*, supra, 256 Ga. App. at 583-584. Thus, the trial court correctly found that the common questions of law presented by these claims predominate over any individual issues that may be present. See *Village Auto Ins. Co.*, supra, 286 Ga. App. at 690-691 (1) (class certification proper where claims focus on "standard practices and documents, not on facts individual to each class member"); *UNUM Life Ins. Co. of America*, supra, 256 Ga. App. at 583 ("[C]laims arising from interpretation of form agreements are considered to be 'classic' cases for treatment as a class action.") (punctuation omitted).

Liberty also argues that the trial court abused its discretion in certifying the class because an individualized inquiry into each state's law to determine whether they have a statute similar to OCGA § 13-1-11 will need to be made, thus making the class unmanageable. Although such an inquiry may be required and may give rise to conflict of law questions, the trial court nevertheless determined that common issues presented in this case predominate over these potential individual issues, and we cannot say that it

---

[12] *Roland v. Ford Motor Co.*, 288 Ga. App. 625, 629 (2) (655 SE2d 259) (2007).
[13] *Earthlink, Inc. v. Eaves*, 293 Ga. App. 75 (1) (666 SE2d 420) (2008).

abused its discretion in doing so. See *UNUM Life Ins. Co. of America*, supra, 256 Ga. App. at 585. Accordingly, the trial court did not abuse its discretion in certifying the class under OCGA § 9-11-23 (b) (3).

3. Liberty contends that the trial court abused its discretion in certifying the class under OCGA § 9-11-23 (b) (2). However, because the trial court did not abuse its discretion in certifying the class under OCGA § 9-11-23 (b) (3), we need not determine whether the court erred in finding the class could alternatively be certified pursuant to OCGA § 9-11-23 (b) (2). See *Earthlink, Inc.*, supra, 293 Ga. App. at 77 (2).

4. Liberty also contends that the trial court abused its discretion in certifying the Georgia subclass. Specifically, Liberty argues that Canada's theft by conversion, theft by deception, and Georgia RICO (OCGA § 16-14-4) claims require proof of reliance by each class member thus making a class action unmanageable. We disagree.

"In general, claims of fraud based upon oral misrepresentations are not appropriate for class treatment because the reliance element must be proved factually for each individual class member." *Life Ins. Co. of Ga. v. Meeks*.[14] However, "the simple fact that reliance is an element in a cause of action is not an absolute bar to class certification." *Klay v. Humana, Inc.*[15] "In claims of fraud based upon written representations, the reliance element may sometimes be presumed." *Life Ins. Co. of Ga.*, supra, 274 Ga. App. at 218 (3) (b). Here, as previously noted, Canada's theft and RICO claims and those of the Georgia subclass are based upon the written representations contained in the provisions of the security agreements serviced by Liberty and not upon any oral representations. Given the fact that similar written representations were common to all the security agreements at issue, the circumstantial evidence that can be used to show reliance is also common to the whole class. See *Klay*, supra, 382 F3d at 1259 (II) (C) (2). Accordingly, the trial court did not abuse its discretion in certifying the Georgia subclass.

*Judgment affirmed. Ellington, J., concurs. Miller, J., concurs fully and specially.*

MILLER, Judge, concurring fully and specially.

While I concur fully in the majority opinion, I write separately to emphasize the deliberate nature of Liberty's conduct, which is apparently calculated to deprive homeowners such as Canada of the protections of the federal bankruptcy laws, thereby subverting the purpose of those laws. I also write to emphasize that the breach of

---

[14] *Life Ins. Co. of Ga. v. Meeks*, 274 Ga. App. 212, 217-218 (3) (b) (617 SE2d 179) (2005).
[15] *Klay v. Humana, Inc.*, 382 F3d 1241, 1258 (II) (C) (2) (11th Cir. 2004).

contract claims asserted by Canada are not without precedent — i.e., they are not as far-fetched as Liberty would have us believe.

Liberty's designated 30 (b) (6) representative testified that with respect to any mortgagor who files for bankruptcy, Liberty automatically orders monthly curbside inspections of the mortgaged property and retains an attorney to protect its interests in the bankruptcy proceeding. Liberty follows this procedure even if the mortgagor has never been in arrears. All charges incurred in connection with the property inspections and legal representation are assessed against the mortgagor's account. Charges for inspection fees are assessed automatically, on a monthly basis, while charges for reimbursement of attorney fees are assessed at the time Liberty receives the bill for the same. Liberty does not provide its mortgagors, during the pendency of their bankruptcy, notice of the fact of the monthly inspections, the fact that monthly charges are being assessed against the mortgagor's account for the same, or the amount of those charges. Nor does Liberty inform the mortgagor that attorney fees incurred by Liberty in connection with the bankruptcy will be assessed against their account, or provide notice at the time those fees are actually assessed. Instead, Liberty deliberately withholds such notice and demands for payment until the mortgagor's bankruptcy is discharged or dismissed — i.e., until the homeowner no longer has the protection of the bankruptcy court and Liberty can be sure that such charges are not subject to approval by that court. Following the resolution of the bankruptcy, Liberty then typically provides notice of the assessments for inspection and attorney fees by sending a standard acceleration letter, such as that received by Canada, giving notice of foreclosure and demanding payment of the entire amount due under the loan agreement.

In light of Liberty's "standard operating procedures," Canada premises her breach of contract claims on the theory that, as a matter of law, public policy, or both, the standard security agreement language at issue must be read in conjunction with the spirit and letter of the bankruptcy laws. This theory is supported by bankruptcy precedent. As one court has explained:

> *Creditors should not be able to assess fees to the account of a person in bankruptcy without the person's knowledge.* A bankruptcy case's purpose is to allow a debtor to get out of financial trouble. At discharge, a debtor ought to be able to expect he or she has brought his or her secured debts current and wiped out all unsecured debts not paid through a plan. Undisclosed fees prevent a debtor from paying the fees in his or her plan — an option that should not be lost simply because a creditor chooses to not list the fee and

expects to collect it later. . . . The right to modify a [Chapter 13] plan for post confirmation defaults [resulting from the post-confirmation assessment of fees] is meaningless if a lender can decide which fees and charges it will disclose and which it will hide until the case is complete and execution on debtor's collateral can be accomplished. *Post confirmation charges, if not disclosed, could also thwart the real purpose of a bankruptcy case.* A debtor that completes his plan by paying off his lender's entire arrearage and post-petition installments may find himself in foreclosure the day after a discharge is granted, based on unpaid and undisclosed post confirmation charges and fees. This result is clearly at odds with the notion of providing a successful debtor a fresh start.

(Emphasis supplied.) *In re Jones*, 366 BR 584, 596 (Bankr. E.D. La. 2007) (disapproving lender conduct identical to Liberty's and rejecting the lender's argument that it had a contractual right to engage in such conduct). See also *In re Sanchez*, 372 BR 289, 305 (c) (ii) (Bankr. S.D. Tex. 2007) ("In failing to make the proper disclosures, the [lender] has acted in a manner antithetical to the spirit of the Bankruptcy Code. The three most important words in the bankruptcy system are: disclose, disclose, disclose."); *In re Watson*, 384 BR 697, 706-707 (Bankr. D. Del. 2008) (noting that a court has the right to determine "whether asserted fees and charges are reasonable under the mortgage instruments and applicable law," and that therefore "the assessment of post-confirmation fees must be fully disclosed both to the Debtors and to the Court"); *In re Nosek*, 363 BR 643, 645 (Bankr. D. Mass. 2007) ("[A lender] cannot use its accounting procedures to contravene the terms of a confirmed Chapter 13 plan and the Bankruptcy Code. [Cit.]").

In light of the foregoing, it is clear that the central question in this case, common to all class members, is whether standard language found in all security agreements serviced by Liberty does, in fact, grant Liberty the contractual right to engage in the conduct at issue. I therefore fully concur in the majority holding affirming the trial court's certification of the class.

DECIDED SEPTEMBER 12, 2008 — RECONSIDERATION DENIED SEPTEMBER 29, 2008 —

*Balch & Bingham, Michael J. Bowers, T. Joshua R. Archer, Christopher S. Anulewicz, Marlie A. McDonnell, Morris, Schneider, Prior, Johnson & Freedman, Lori L. McGowan*, for appellant.

*Claeys, McElroy & Macgruder, Angela C. McElroy, Bell & James, John C. Bell, Jr., Bell & Brigham, Leroy W. Brigham, Roy E. Barnes,* for appellee.