# WHOLE COURT

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 16, 2013**

# In the Court of Appeals of Georgia

A13A0455. GEORGIA-PACIFIC CONSUMER PRODUCTS, LP v.
    RATNER et al.

ELLINGTON, Presiding Judge.

Four Effingham County property owners[1] sued Georgia-Pacific Consumer Products, LP ("Georgia-Pacific") for nuisance, trespass, and negligence arising out of the intermittent but continuing release of hydrogen sulfide gas onto their properties from Georgia-Pacific's Savannah River Mill ("the mill") in Rincon.[2] The plaintiffs moved the trial court to certify a class consisting of the owners of 65 additional properties neighboring the plant. After a hearing, the trial court certified the class

---

[1] Class representatives Kirbi and Aaron Ratner own a single family residence in Mallard Crossing, in Rincon. David and Kathy McDonald own a single family home in Mallard Pointe, Rincon.

[2] The facility operates a paper mill, a power plant, a waste water treatment facility, a landfill, and sludge fields.

pursuant to OCGA § 9-11-23 (c) (1).[3] Georgia-Pacific contends that the trial court abused its discretion when it certified the class. We disagree and, for the reasons set forth below, we affirm.

> Under OCGA § 9-11-23, a class action is authorized if the members of the class share a common right and common questions of law or fact predominate over individual questions of law or fact. The character of the right sought to be enforced may be common although the facts may be different as to each member of the alleged class.

(Footnotes omitted.) *Bd. of Regents of the Univ. Sys. of Ga. v. Rux*, 260 Ga. App. 760, 764 (3) (580 SE2d 559) (2003). In order to gain class certification, a plaintiff has the burden of establishing that the prerequisites of OCGA § 9-11-23 (a) have been satisfied, those being (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. See OCGA § 9-11-23 (a); see also *EarthLink, Inc. v. Eaves*, 293 Ga. App. 75, 76 (1)(666 SE2d 420) (2008) ("Under Georgia law, a case may proceed as a class action if all prerequisites of OCGA § 9-11-23 (a) are satisfied: numerosity, commonality, typicality, and adequacy[.]"). Additionally, the class must satisfy at

---

[3] "As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subsection may be conditional, and may be altered or amended before the decision on the merits." OCGA § 9-11-23 (c) (1).

2

least one ground under OCGA § 9-11-23 (b), which provides, in relevant part, that a case may proceed as a class action if

> the prerequisites of OCGA § 9-11-23 (a) are satisfied and[ ] (1) the prosecution of separate actions would create a risk of inconsistent adjudications or would impair other parties' ability to protect their interests; (2) the defendant has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or declaratory relief with respect to the whole class; or (3) questions of law or fact common to members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

(Footnote omitted.) *EarthLink, Inc. v. Eaves*, 293 Ga. App. at 76 (1); see also OCGA § 9-11-23 (b). "[W]e review the trial court's decision in certifying or refusing to certify a class action for an abuse of discretion." (Citation omitted.) *Rite Aid of Ga., Inc. v. Peacock*, 315 Ga. App. 573 (726 SE2d 577) (2012). This Court "will not reverse the factual findings in a trial court's class certification order unless they are clearly erroneous[.]" Id. "Implicit in this deferential standard of review is a recognition of the fact-intensive basis of the certification inquiry and of the trial court's inherent power to manage and control pending litigation." *Resource Life Ins. Co. v. Buckner*, 304 Ga. App. 719, 729 (2) (698 SE2d 19) (2010).

3

The facts relevant to this dispute are as follows. The mill has been in operation since 1986. Since 1992, Georgia-Pacific has received complaints from neighboring property owners concerning noxious gasses emanating from the mill's grounds, and the mill took steps to rectify the problem with some success. However, in 2006, the mill began receiving complaints about noxious odors emanating from the plant from surrounding landowners, including homeowners in a new subdivision, Mallard Pointe, located directly across the street from the mill. The plaintiffs submitted evidence of 107 odor-related complaints from 2006 through 2012, 28 of which came from the Mallard Pointe landowners. The landowners complained that the noxious gases, among other things, interfered with their ability to enjoy their properties; irritated their eyes, skin, and lungs and made them feel ill; and damaged some exterior household fixtures, primarily air conditioning equipment. Further, the landowners were concerned that continued emissions from the mill would adversely affect the value and marketability of their properties.

In response to these complaints, Georgia-Pacific identified the noxious gas as hydrogen sulfide fumes "created by the biological breakdown of living organisms necessary to [the mill's] wastewater treatment process" and intermittently emanating from pits containing sludge produced by that process. The mill is deemed a "major

source" of pollutants, including hydrogen sulfide, and must demonstrate compliance with both federal and state law in order to obtain permits to operate.[4] To abate the problem, Georgia-Pacific admitted that it has considered closing three of the sludge pits thought to be the source of most of the hydrogen sulfide gas. Documents produced by Georgia-Pacific revealed that numerous property owners neighboring the mill have complained that the gases emanating from the plant have caused their air conditioning systems to fail. Georgia-Pacific has paid to replace or to repair air conditioning units on at least 20 homes in the area, most of which are located in the Mallard Pointe subdivision. The plaintiffs' expert witnesses opined that the homes in the area surrounding the mill are exposed to enough hydrogen sulfide to cause corrosive damage to air conditioning units and that, indeed, evidence of such damage was found in the units inspected. Documents produced by Georgia-Pacific also demonstrated that hydrogen sulfide gas emissions could cause substantial corrosion of metal components within a half-mile of the storage area.

The named plaintiffs filed suit on December 10, 2010, and they sought certification for a class consisting of certain Georgia citizens owning property within

[4] See the Georgia Air Quality Act, OCGA § 12-9-1, et seq., Georgia Rules for Air Quality Control, Chapter 391-3-1, and Title V of the Clean Air Act, 42 U.S.C.S. § 7401 et seq.

a half-mile of a geographic point near the mill. They amended the complaint on January 13, 2012, to propose a class consisting of property owners neighboring the mill within a discrete area circumscribed by roads, railroad rights-of-way, and specific geographic coordinates. The area includes 34 residential properties and 33 parcels zoned industrial, agricultural, or other. It is undisputed that each of the properties in the area have either been exposed to the hydrogen sulfide gas to some degree or is at risk of exposure given the proximity to the mill.[5] The mill's environmental manager deposed that hydrogen sulfide gas can be detected up to four miles away from the plant. The property in the class area furthest from the mill's sludge field is less than a mile away. . In an affidavit offered in support of class certification, a real estate appraiser averred that, based upon his examination of the

---

[5] The dissent focuses on distinctions (the type of property, the length of exposure, the degree of physical damage, etc.) that may be relevant to the amount of money *damages* appropriate to each class member, but the nature of the *injury* to each member of the class is nevertheless the same. Further, the plaintiffs are not bringing claims for bodily injury and thus will not be pursuing "necessarily individualized injuries" as the dissent asserts. The defendant admitted that the release of hydrogen sulfide gas from its wastewater treatment process creates a problem for neighboring landowners; moreover, it admitted that it has taken measures to remedy the problem. That problem is essentially the same for each landowner: exposure to hydrogen sulfide gas, a corrosive and irritating pollutant.

area around the mill, "the reported toxic fumes would constitute a factor impairing the value and marketability" of the properties included in the proposed class.

After a hearing, the trial court issued an order certifying the class. Although Georgia-Pacific challenges each of the court's legal findings and contends the trial court abused its discretion in certifying the class, it did not enumerate as error any specific factual finding made by the superior court. Because the superior court's detailed order adequately addresses the issues raised by the appellant, we adopt the court's order certifying the class as our opinion in this case. We note that the superior court prefaced its opinion with a lengthy acknowledgment that it was undertaking a "rigorous analysis" in light of recent United States Supreme Court precedent.[6] The following is excerpted, with minor modifications, from the order of the trial court.

---

[6] The superior court, citing this Court's opinion in *Rite Aid of Ga., Inc. v. Peacock*, 315 Ga. App. at 573, and the United States Supreme Court's precedent cited therein, *Wal-Mart Stores v. Dukes*, ___ U. S. ___, ___ (II) (A) (131 SCt 2541, 180 LE2d 374) (2011), wrote that a class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." The court noted that, in order to justify a departure from "the usual rule" and establish that a case is sufficiently exceptional to warrant class treatment, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule." Id. at 2551. The court further noted that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." The court acknowledged that the plaintiffs were required to carry their burden with"significant proof." The court then proceeded to set forth its required factual findings and conclusions of law.

7

This action asserts claims in nuisance, trespass and negligence on behalf of a class of property owners defined as follows:

All citizens of the State of Georgia who, as of November 18, 2010, owned property lying, in whole or in part, within an area of land lying in Effingham County, Georgia, and bounded as follows: On the east by a line running along the west side of the right of way of Fort Howard Road between the intersection of Fort Howard Road and Seckinger Ford Road and the south side of the right of way of the railroad line that serves the Georgia-Pacific Plant; On the north by a line running along the south side of said railroad right of way between Ford Howard Road and Rincon Stillwell Road; On the west by a line running along the east side of the right of way of Rincon Stillwell Road: On the south by a line running along the north side of the right of way of Bunyan-Kessler Road beginning at Rincon-Stillwell Road and going in an easterly direction to a point at Latitude 32.30582649 and Longitude minus 81.21047668 and thence easterly along a straight line to the intersection of Fort Howard Road and Seckinger Ford Road. Expressly excluded from membership in the class are the above-named Defendant, its related corporations and all directors, officers and employees of the Defendant.

This class definition is unambiguous and the members of the class are readily identifiable from public records. The amended complaint asserts that the releases of hydrogen sulfide gas from the waste produced

by the mill permeate the class area, have interfered with the use and enjoyment of property and have impaired the value of the properties owned by members of the proposed class.

*1. OCGA § 9-11-23 (a) Analysis.*

*a. Numerosity*

Evidence in the record supports a finding that the owners of the properties within the proposed class who are the members of the proposed class are readily identifiable and that public records identify 116 individual owners and sixteen corporate owners of the property that lies within the bounds of the proposed class area. The "impracticality of joinder . . . is generally presumed if a putative class amounts to more than forty individuals." (Citations and punctuation omitted.) *American Debt Foundation, Inc. v. Hodzic*, 312 Ga. App. 806, 809 (1), n. 15 (720 SE2d 283) (2011). Georgia-Pacific asserts that the numerosity requirement is not met because it would be, in its view, practical to join all 116 individuals and sixteen corporate owners of property within the proposed class area in a single action.[7] The number of members of the proposed class meets the numerosity requirement. The case management tools afforded a trial court by OCGA § 9-11-23 make this action far

---

[7] Georgia-Pacific's argument that it would be permissible to join all of the putative class members as named parties in this action rather than the case proceeding as a class action could be viewed as an acknowledgment that the claims being asserted on behalf of these absent class members arise, out of the same transaction, occurrence, or series of transactions or occurrences, and raise common questions of law and fact as required for joinder of parties in a single action.

more manageable as a class action than would be a mass joinder action. The Court finds that joinder of this many parties is impractical and that the numerosity of OCGA § 9-11-23 (a) (1) is met.

b. *Commonality*

OCGA § 9-11-23 (a) (2) requires that there be "questions of law or fact common to the class[.]" "[T]he commonality requirement does not require that all questions of law and fact be common to every member of the class. Rather, the rule requires only that resolution of the common questions affect all or a substantial number of the class members." (Citations and punctuation omitted.) *Flournoy v. Honeywell Intl, Inc.*, 239 FRD 696, 699 (S.D. Ga. 2006). See also *Brenntag Mid South, Inc. v. Smart*, 308 Ga. App. 899, 906 (2) (b) (i) (710 SE2d 569) (2011).

The record supports a finding that there are a number of issues of fact common to the class given that the claims asserted on behalf of all members of the proposed class are based upon harm allegedly caused by hydrogen sulfide gas coming from the mill. The noxious smell, toxicity, and corrosive nature of this chemical present questions of fact common to the class. Other common questions involve: (a) the safety programs implemented by Georgia-Pacific at the mill and their adequacy; (b) the materials used at the mill, including those in the landfill and sludge fields; (c) the causes and effects of toxic releases from the mill, including those from its sludge fields and landfill; (d) all factual issues relating to Georgia-Pacific's operation of the mill, including its generation, storage and use of materials and products at the plant, including its sludge fields and landfill, and the precautions that it undertakes to prevent releases of pollutants into the environment; (e) the

10

liability of Georgia-Pacific; (f) common affirmative defenses raised by Georgia-Pacific; (g) remedies available under Georgia law and the appropriate measure of damages; (h) the claim for expenses of litigation; and (i) the claim for exemplary damages.

The trial of a single case or the trial of this case on a class-wide basis would involve many of the same witnesses, same documents and same testimony and would require resolution of the same issues of both law and fact. Some number of individualized questions will almost assuredly be presented. However, the prevailing common questions make this matter appropriate for resolution as a class action. The requirement for the existence of common questions of law and fact is met.

*c. Typicality*

OCGA § 9-11-23 (a) (3) requires that the claims asserted by the named parties and the defenses raised thereto by Georgia-Pacific be typical of the claims asserted on behalf of the class and the defenses raised by Georgia-Pacific to those claims. This requirement of typicality has been held to require a showing of, "the same unlawful acts [by the defendant] in the same method against [the] entire class." (Citation, punctuation and footnote omitted.) *Liberty Lending Svcs. Inc. v. Canada*, 293 Ga. App. 731, 738 (1) (b) (668 SE2d 3) (2008). The claims asserted on behalf of the named plaintiffs are, in this case, the same as the claims asserted on behalf of the class, namely that the release of hydrogen sulfide gas has damaged their respective properties. While there may be different types of affected properties involved in this case, the basic claims of nuisance, trespass, and negligence are the same. The common proof would show the same unlawful acts by Georgia-Pacific

11

in the same method against the entire class. Id. Thus, the requirement of typicality is met.

### d. Adequacy of Representation

OCGA § 9-11-23 (a) (4) requires a finding that the "representative parties will fairly and adequately protect the interests of the class." The focus of adequacy of representation is on class counsel. *Stevens v. Thomas*, 257 Ga. 645, 649 (2) (361 SE2d 800) (1987) ("The important aspects of adequate representation are whether the plaintiffs' counsel is experienced and competent and whether plaintiffs' interests are antagonistic to those of the class.") (citation omitted). Georgia-Pacific has agreed that plaintiffs' counsel will provide adequate representation. There was no showing of any antagonistic interests between those of the class representatives and the interests of the members of the proposed class. The Court finds, as a matter of fact, that the named plaintiffs and their counsel will provide adequate representation of the interests of the class.

### 2. OCGA § 9-11-23 (b) (3) Analysis.

Having concluded that the requirements of OCGA § 9-11-23 (a) have been met, the court now addresses the requirements of OCGA § 9-11-23 (b) (3). Under Rule 23 (b) (3) a class may be certified if the questions of law or fact predominate over individual issues and "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." OCGA § 9-11-23 (b) (3).

Factors to be considered include:
(A) [t]he interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) [t]he extent and nature

12

of any litigation concerning the controversy already commenced by or against members of the class; (C) [t]he desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) [t]he difficulties likely to be encountered in the management of a class action.

OCGA § 9-11-23 (b) (3).

> *a. Predominance of Common Issues Over Individual Issues*
> Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief. Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23 (b) (3).

(Citation omitted.) *Liberty Lending Svcs v. Canada*, 293 Ga. App. at 739-740 (2). When determining whether common issues predominate, the proper focus is on issues of fact and law that relate to *liability* rather than damages. See *Brenntag Mid South, Inc. v. Smart*, 308 Ga. App. at 906 (2) (b) (i); see also *Resources Life Ins. v. Buckner*, 304 Ga. App. at 732. Thus, "[c]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." (Citations and punctuation omitted.) *In re Tri-State Crematory Litigation*, 215 FRD 660, 694 (N.D. Ga. 2003).

13

See also *Sterling v. Velsicol Chem. Corp.*, 855 F2d 1188, 1197 (6th Cir. 1988) ("where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy"). The resolution of whether common issues predominate is a matter addressed to the discretion of the trial court. *Fortis Ins. Co. v. Kahn*, 299 Ga. App. 319, 323 (2) (a) (683 SE2d 4) (2009).

Here, the determination of Georgia-Pacific's liability to class members will necessarily focus on the its conduct, the toxicity and corrosiveness of hydrogen sulfide, and the legal issues flowing from the law of nuisance, trespass and negligence.[8] Defendant argues that each affected property owner was affected in different ways and degrees, necessitating numerous individualized determinations of harm. Further, Defendant argues that each property owner would have to prove the various elements of nuisance, trespass and negligence as to their respective properties. All of this, according to Defendant, shows that individual questions of law and fact predominate over the common ones in this case. While Georgia-Pacific's contentions have some merit as each plaintiff will have unique elements or amounts of damage, there are more significant questions that are common to the class and which

---

[8]    The common issues listed above in Division 1 (b) concerning commonality are also common issues in regard to the predominance analysis, as the legal and factual issues regarding the liability and damages caused by the mill's hydrogen sulfide emissions to the property of the named plaintiffs are the same as the issues of liability and damage to the rest of the class.

14

predominate over the individual issues in this case. The superior court anticipated that the evidence as to liability would be presented on a class-wide basis, and would be the same for all class members. That the amount of damages may vary among class members does not defeat the predominancy of common issues as to liability. Georgia-Pacific is the sole defendant and its conduct is the only conduct at issue. The same negligent actions are alleged to have caused harm to each class member in substantially the same ways. The same types of damages are sought for every class member. The Complaint sets forth the common course of conduct alleged by the plaintiffs. Under these facts and the controlling authority cited above, the Court finds that the common issues of fact and law predominate over any individual issues.

*b. Superiority*

OCGA § 9-11-23 (b) (3) lists factors for a court to consider when making its determination as to whether a class action is superior to other alternative procedures to adjudicate the case.[9] The cost to hire experts, to conduct discovery, and to present the case for trial for an individual party owning property in the class area would be essentially the same as preparing and presenting the case for all class members. The cost of

---

[9]  OCGA § 9-11-23 (b) (3) lists the following factors: "(A) The interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) The difficulties likely to be encountered in the management of a class action."

15

preparation of an individual claim could well exceed the potential recovery of actual damages. The efficiencies of preparation and presentation on a class-wide basis outweigh any interest of class members proceeding on an individual basis. Moreover, anyone who wishes to opt out will be given the opportunity to opt out of this class action. There is no other competing litigation of the claims presented in this action. The Superior Court of Effingham County is the logical court to adjudicate these claims. This case, as presented, should be manageable as a class action. The Court notes that counsel for plaintiffs and for Georgia-Pacific have extensive experience in representation of parties in class actions adjudicating claims brought on behalf of property owners for damage caused by releases of hazardous chemicals, and that these cases have been managed to a final conclusion. A class action would clearly be more manageable than dozens of separate lawsuits or mass joinder of over a hundred named plaintiffs in a single action. The use of experts, likely including an attorney, real estate agent, environmental scientist and an appraiser, giving testimony relevant to the claims of all class members is far more efficient and manageable than numerous trials for each separate property owner.

We find the trial court's reasoning given the facts of this case reasonable and supported by competent evidence. Thus, we find no abuse of discretion in the court's decision to certify the class.

*Judgment affirmed. Phipps, C. J., Barnes, P. J., and Miller, J., concur.*

*Andrews, P. J., Ray and Branch, JJ., dissent.*

A13A0455.  GEORGIA-PACIFIC CONSUMER PRODUCTS, LP
    v. RATNER et al.

BRANCH, Judge, dissenting.

I believe that the trial court erred when it certified this class consisting of Effingham County property owners allegedly harmed by appellant Georgia-Pacific's facility's release of hydrogen sulfide gas over a period of years. I therefore dissent.

As the majority notes, we review a trial court's decision in certifying or refusing to certify a class for an abuse of discretion. *Jones v. Douglas County*, 262

Ga. 317, 323-324 (2) (418 SE2d 19) (1992).[1] The facts relevant to this appeal are not in dispute. In 2006, the Mill began receiving complaints from Mallard Pointe landowners, including the plaintiffs, about noxious odors alleged to cause physical consequences including difficulty breathing, coughing or choking, headaches, and vomiting. Some homeowners also complained that the odors had made it more difficult for them to sell their houses.[2] During this same period, a number of Mallard Pointe homeowners complained that the odors were penetrating into their houses. Residents also complained that exterior household fixtures, and especially air conditioning units, were suffering from unusual levels of corrosion and mechanical failure.

---

[1] See also *Reed v. State*, 291 Ga. 10, 13 (3) (727 SE2d 112) (2012) (an "abuse of discretion" standard of review is not identical to the "clearly erroneous" or "any evidence" standards; "where a determination by the trial court involves an exercise of discretion, the standard of review is 'abuse of discretion,' which is at least slightly less deferential than the 'any evidence' test") (citations omitted)

[2] One of the documents cited by plaintiffs on this point shows that in September 2007, one homeowner listed her house for sale but delisted it after telling her real estate broker "everything" about the odors. Other parts of the record show that in November 2009, one homeowner attributed her house's failure to sell to "the economy"; in August 2010, another attributed the same outcome to "the economy, the odor *and* the polluted groundwater in the area." (Emphasis supplied).

In response to these complaints, Georgia-Pacific took short-term steps to remedy the odors including the installation of an odor abatement system in July 2006 and the use of flares to burn off fumes from October 2007 through at least June 2011. By September 2010, Georgia-Pacific had drawn up plans, not completed as of March 2012, to close three of the pits thought to be the source of most of the odors. Georgia-Pacific also paid to replace or repair air conditioning units on at least 20 homes in the area, most of which were located in Mallard Pointe, and some of which required more than one replacement or repair.

Plaintiffs' amended complaint featured a proposed class of Georgia citizens owning property within an area circumscribed by area roads, railroad rights-of-way, and one specified latitude and longitude. The 67 properties included in the proposed class consist of 34 residences and 33 other parcels of industrial, agricultural, timber or vacant land. In an affidavit submitted by plaintiffs in support of the geographical boundaries of the proposed class, real estate appraiser Henry Garrett averred that based on his examination of the area around the Mill, "the reported toxic fumes would constitute a factor impairing the value and marketability of property within [the] area" defining the class. When asked at his 2012 deposition what the "affected area" was, Garrett responded: "We're in the process of trying to establish [the class area] . . . .

But until I do my due diligence within that area, I don't know how many of the houses have been affected or may be affected."

Garrett also testified that he had collected no sales or market data to ascertain whether property values had been affected by the releases of hydrogen sulfide. When asked whether more investigation of each property was needed as to which areas within the class were "actually affected," Garrett replied:

> [W]e took a boundary – we looked at a boundary area to describe an area where the potential for problems could exist. *Properties within that boundary area could or could not be adversely affected by the existence of the pollution,* . . . whatever it is that's polluting and causing these air conditioning units to have a problem. So, it would take further investigation on my part, or somebody's part, to determine the individual damages to each one of the properties and the amounts of those damages, whether it's severe, or whether it's minor . . . . [E]ach individual property within that class is looked at on a case-by-case basis.

(Emphasis supplied.) Garrett also confirmed that the class could become larger or smaller "depend[ing] on looking at each property and determining . . . whether it's been affected or not." When asked whether he had followed any specific "appraisal methodology," Garrett replied:

4

*I think it's a seat of the pants kind of thing.* You have to be on the property, you have to look at the topography, you have to look at the boundaries, you have to look at the different areas, to determine what might or might not be affected by whatever it is that you're dealing with in terms of contamination.

(Emphasis supplied.) When asked whether he had consulted any appraisal or scientific literature in his work thus far on the case, Garrett replied that he had not.

Other experts produced by plaintiffs testified that without chemical tests of each affected air conditioning unit, it would be unreasonable to conclude that any corrosion of those units was the result of a chemical reaction, and that it was not yet known whether the hydrogen sulfide actually released onto each property was sufficient to cause corrosion there. Although plaintiffs introduced no expert testimony concerning the health effects of the hydrogen sulfide releases, Georgia-Pacific's medical expert averred that the symptoms alleged have many common causes such that each class member would be required to undergo a "unique" or "tailored" medical evaluation in order to determine the cause of each plaintiff's condition.

In determining whether a Georgia class action should proceed, "the first issue to be resolved is not whether the plaintiffs have stated a cause of action or may ultimately prevail on the merits but whether the requirements of OCGA § 9-11-23 (a)

5

have been met." (Citations and punctuation omitted.) *Rite-Aid of Ga. v. Peacock*, 315 Ga. App. 573, 574 (1) (726 SE2d 577) (2012) (cert. denied, Oct. 29, 2012). Under OCGA § 9-11-23 (a), and as the majority notes, a plaintiff may sue on behalf of a class "only if" all four of the following requirements are met:

> (1) The class is so *numerous* that joinder of all members is impracticable; (2) There are *questions of law or fact common* to the class; (3) The *claims or defenses* of the representative parties are *typical* of the claims or defenses of the class; and (4) The representative parties will *fairly and adequately protect the interests* of the class.

(Emphasis supplied.) Under subsection (b) of the same statute, the plaintiff must also prove at least one of the following: that (1) "[t]he prosecution of separate actions by or against individual members of the class would create a risk" of "[i]nconsistent or varying adjudications with respect to individual members of the class"; (2) "[t]he party opposing the class has acted or refused to act on grounds generally applicable to the class," thereby making injunctive or declaratory relief "appropriate" as to the entire class; or (3) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," such that "a class action is superior to other available methods for the fair and efficient

adjudication of the controversy." OCGA § 9-11-23 (b) (1) (A) and (B), (b) (2), and (b) (3).

A failure to establish each of the requirements of OCGA § 9-11-23 (a) and at least one of the requirements of OCGA § 9-11-23 (b) is fatal to class certification. See *Rite-Aid*, supra at 578 (1) (a), (b) (plaintiffs' failure to prove commonality, typicality, and adequacy required reversal of class certification). In *Rite-Aid*, for example, we noted with approval the United States Supreme Court's explanation of the burden of proof facing a class representative on a motion for certification under Rule 23 of the Federal Rules of Civil Procedure, on which OCGA § 9-11-23 is modeled:

> [S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, and that *certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites to [certification] have been satisfied*. Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.

(Emphasis supplied and omitted.) *Rite-Aid*, supra at 574-575 (1), quoting *Wal-Mart Stores v. Dukes*, ___ U. S. ___, ___ (II) (A) (131 SCt 2541, 180 LE2d 374) (2011).

7

(a) *Section 9-11-23 (a): Commonality and Typicality.* As we noted in *Rite-Aid*, "'any competently crafted class complaint literally raises common questions.'" (Citation and punctuation omitted.) Id. at 575, quoting *Dukes*, supra at 2551 (II) (A).

> What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

(Emphasis in original; citation and punctuation omitted.) *Dukes*, supra at 2551 (II) (A). As the Supreme Court of Georgia has likewise stated, therefore, "a common question is not enough when the answer may vary with each class member and is determinative of whether the member is properly part of the class." (Footnote and emphasis omitted.) *Carnett's, Inc. v. Hammond*, 279 Ga. 125, 129 (4) (610 SE2d 529) (2005). Although a class may be certified when "common questions predominate, . . . even if some individual questions of law or fact exist," *Village Auto Ins. v. Rush*, 286 Ga. App. 688, 691 (1) (649 SE2d 862) (2007), a plaintiff seeking to represent a class must show "'that the class members have suffered the same injury, [which] does not mean merely that they have all suffered a violation of the same provision of law.'" (Citation and emphasis omitted.) *Rite-Aid*, supra at 575 (1) (a), quoting *Dukes*, supra

8

at 2551 (II) (A). As the *Dukes* Court also noted, "the commonality and typicality requirements of Rule 23(a) tend to merge" in that "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, supra at 2551, n. 5 (II) (A).

The threshold inquiry in any commonality analysis is that of class definition – that is, "whether a precisely and appropriately defined class exists and whether the named [p]laintiffs are members of the proposed class." *Kemblesville HHMO Ctr. v. Landhope Realty Co.*, Case No. 08-2405, 2011 U. S. Dist. LEXIS 83324 at *14 (E. D. Pa., decided July 27, 2011) (citations and punctuation omitted). Class members must be "readily identifiable such that a court can determine who is in the class and bound by its ruling without engaging in numerous fact-intensive inquiries." *Jim Ball Pontiac-Buick-GMC v. DHL Express*, Case No. 08-CV-761C, 2012 U. S. Dist. LEXIS 13546 at *2 (W. D. N. Y., decided Feb. 3, 2012). Factors to consider in evaluating the viability of a proposed class include whether there is "a particular group that was harmed during a particular time frame, in a particular location, in a particular way," and whether class membership has been defined "in some objective manner."

9

*Kemblesville*, supra at *14. "Certification should be denied when determining membership in the class would essentially require a mini-hearing on the merits of each case." Id.

Under this rubric, plaintiffs were required to make a factual showing that even allowing for some variation between the effects of numerous releases on individual properties and property owners, each member of the proposed class has suffered "'the same injury.'" *Rite-Aid*, supra at 575 (1) (a), quoting *Dukes*, supra at 2551. This plaintiffs have failed to do. First, and although plaintiffs, as well as the majority, would have us ignore any claims for personal injury on appeal, the complaint alleges that the "ongoing releases of toxic chemicals and fumes by [Georgia-Pacific] constitute continuing nuisances doing harm to [both] the property within the class area and the persons who own those properties," with plaintiffs' suffering various symptoms (as listed in their appellate brief) including difficulty breathing, headaches, and vomiting. As a result of these necessarily individualized injuries, plaintiffs cannot show that Georgia-Pacific "committed the same unlawful acts in the same method against an entire class." *Liberty Lending Svcs.v. Canada*, 293 Ga. App. 731, 738 (1) (b) (668 SE2d 3) (2008) (citation and punctuation omitted); see also *Georgine v. Amchem Products*, 83 F.3d 610, 627 (III) (A) (3d Cir. 1996), aff'd, *Amchem Products*

10

*v. Windsor*, 521 U. S. 591 (117 SCt 2231, 138 LE2d 689) (1997) (even when plaintiffs' exposure to asbestos posed a common question, the trial court erred when it certified a class; "the commonality barrier is higher in a personal injury damages class action, like this one, that seeks to resolve all issues, including noncommon issues, of liability and damages"). Second, plaintiffs' own accounts of the impact of the releases on the values of their homes show that the properties may have failed to sell because of economic conditions as much as from any nuisance suffered. According to their own experts, moreover, plaintiffs' amended class definition was a "seat-of-the-pants" result reached without determining whether each included property had actually been affected by any or all of the Mill's hydrogen sulfide releases over a period of some years, let alone whether each property suffered the same kind of measurable injury as a result.

In light of their failure to establish even the fundamental proposition that the Mill's hydrogen sulfide releases actually affected each property included in the class, and because of the necessity of conducting numerous fact-intensive inquiries as to the scope of their injuries, plaintiffs' "mere claim" that they have suffered a common injury "gives no cause to believe that all their claims can be productively litigated at once." *Dukes*, supra at 2551 (II) (A). Specifically, plaintiffs have failed (1) to provide

11

evidence that numerous hydrogen sulfide releases over a period of years affected all of the persons and properties included in the proposed class in a substantially similar way; (2) to show that the injuries they and/or their properties have suffered are "common" to or "typical" of most or all members of the class"; or (3) to show that the class definition is the result of a rational determination of the actual effects of the hydrogen sulfide releases at issue. Thus the class appears to have been defined not by any "logical" determination of the actual effects of the Mill's numerous and intermittent releases of hydrogen sulfide on persons and property over a period of years, but rather by means of "arbitrarily drawn lines on a map." (Citations and punctuation omitted.) *Brockman v. Barton Brands*, Case No. 3:06CV-332-H, U. S. Dist. LEXIS 86732 at **5, 9 (II) (A) (W. D. Ky. 2007, decided November 20, 2007) (denying class certification where plaintiffs offered "no evidence whatsoever" that contaminants "spread in a uniform fashion in all directions" from defendants' distillery). I would therefore conclude that the trial court abused its discretion when it certified the class. *Rite-Aid*, supra at 576-578 (1) (reversing certification of a class when plaintiffs failed to show that they suffered any legally cognizable injury); *Kemblesville*, supra at **18, 22 (denying class certification where geographic definition of a class was "arbitrary and not reasonably related to evidence of record"

12

concerning the contamination at issue, where plaintiffs had failed to show a "reasonable relationship" between the relevant [groundwater contaminant] release and the proposed class area," and where plaintiffs also failed to offer a "dispersal model or concrete expert opinion as to the extent or eventual movement" of the alleged plume). Compare *Brenntag Mid South v. Smart*, 308 Ga. App. 899, 904 (2) (a) (iii) (710 SE2d 569) (2011) (trial court did not err in certifying a class consisting of persons living in evacuation zone after a single accidental release of glacial acetic acid from a chemical storage tank).

(b) *Section 9-11-23 (b): Predominance of Common Questions and Superiority of Class Action as a Remedy.* Although plaintiffs' failure to prove commonality and typicality should dispose of the issue whether the trial court erred when it certified the class, see *Rite-Aid* at 578 (1) (b), I also note that plaintiffs have not met the requirements of OCGA § 9-11-23 (b) (3), under which a class may be certified if "questions of law or fact predominate over any questions affecting only individual members" *and* if "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

> The Rule 23 (b) (3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. A plaintiff may satisfy this requirement by showing that

13

issues subject to class-wide proof predominate over issues requiring proof that is unique to the individual class members. Therefore, *class certification is not appropriate if resolution of individual questions plays a significant, integral part of the determination of liability*. But as long as the common questions predominate, a class may be certified even if some individual questions of law or fact exist.

(Citations and punctuation omitted; emphasis supplied.) *Brenntag*, supra at 906 (2) (b) (i).

The United States Supreme Court has highlighted the "disparate questions undermining class cohesion" in cases involving numerous plaintiffs' exposure to pollutants or contaminants over years or decades, noting that "[e]ven if [Federal] Rule 23 (a)'s commonality requirement may be satisfied" as to a particular class, "the predominance criterion [of Rule 23 (b) (3)] is far more demanding." *Amchen Products v. Windsor*, 521 U. S. 591, 623-624 (IV) (A) (117 SCt 2231, 138 LE2d 689) (1997). This Court has thus reversed a trial court's certification of a class as to liability when individualized questions as to the cause, extent and nature of plaintiffs' injuries predominate over common ones. *Doctors Hosp. Surgery Ctr. v. Webb*, 307 Ga. App. 44, 47-48 (2) (704 SE2d 185) (2010) (reversing certification of class arising from a hospital's failure to properly sterilize equipment in colonoscopies administered to

1300 patients over a period of more than a year in the absence of "proof that the defendant's negligence was both the cause in fact and the proximate cause of the injury"; plaintiffs' injuries, including anxiety, loss of consortium, and emotional distress, were "inherently specific to the individuals affected"). Other courts have also concluded that a class action is not a superior method for adjudicating cases involving environmental contamination not involving a single exposure where "no evidence is offered establishing class-wide contamination." *Duffin v. Exelon Corp.*, 2007 U. S. Dist. LEXIS 19683 at * 11 (II) (B), *24 (II) (D) (N.D. Ill., March 19, 2007) (refusing to certify a class allegedly injured by the release of six million gallons of tritium-contaminated water through a pipeline into a river over a period of five years when the class area was "defined in geographic terms unrelated to evidence of actual tritium contamination," when the class was "plainly overbroad," and when common questions did not predominate over "questions affecting individual members").

As I have already noted, the personal injuries suffered by some class members range from difficulty breathing to coughing or choking, headaches, and vomiting – proving the causation of which will be "inherently specific to the individuals affected." *Doctors Hosp.*, supra at 48 (2). As to property damage, the undisputed testimony of plaintiffs' own experts shows that (1) plaintiffs have not established

15

whether most of the properties within the geographical boundaries of the class have actually been affected by multiple releases of hydrogen sulfide from the Mill over a period of years; (2) no sales or market data has shown that property values have been affected by the releases; and (3) it is not yet known whether the hydrogen sulfide present on any property was the proximate cause of air conditioning units or other fixtures there. At the very least, this undisputed evidence shows that "substantial factual differences" are likely to emerge between class members whose properties were most affected and others such that "[s]ignificant trial time would be devoted to determining separate issues of liability," including proximate causation, "regarding individual properties." *Duffin*, supra at *24 (II) (D).

For these reasons, I conclude that plaintiffs have failed to demonstrate, as they are required to do by OCGA § 9-11-23 (b) (3), that a class action is superior to traditional means of adjudicating their claims. Id.; *Doctors Hosp.*, supra at 47-48 (2) (reversing grant of class certification as to liability where common questions as to the extent and nature of plaintiffs' injuries did not predominate over individual ones).

I respectfully dissent. I am authorized to state that Andrews, P. J., and Ray, J., join in this dissent.